**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **VENERA SWAISS o/b/o Hazem Swaiss,** | ) | |
| **Plaintiff,** | ) | **No. 13 C 8143** |
| | ) | |
| **v.** | ) | **Magistrate Judge Geraldine Soat Brown** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Venera Swaiss, on behalf of her deceased spouse Hazem Swaiss ("Claimant"), brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c) for judicial review of the Social Security Administration Commissioner's ("Commissioner") decision denying Claimant's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act, 42 U.S.C. §§ 421, 423. (Compl.) [Dkt 1.][1] Plaintiff filed a brief in support of reversing the decision of the commissioner of social security. (Pl.'s Br.) [Dkt 20.] The Commissioner opposed Plaintiff's memorandum by filing a motion for summary judgment (Def.'s Mot. Summ. J.) [dkt 24], in addition to a supporting memorandum (Def.'s Mem.) [dkt 25]. Plaintiff replied. (Pl.'s Reply.) [Dkt 26.] The parties consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). (Joint Consent Agreement.) [Dkt 7.]

---

[1] The regulations regarding DIB and SSI are substantially similar, and where they do not significantly differ only one section will be cited. *See Ashpaugh v. Apfel*, No. 98 C 6561, 2000 WL 1222153, at *1 n. 3 (N.D. Ill. Aug. 22, 2000).

For the reasons set forth below, the Commissioner's motion is denied. There is an inconsistency in the Administrative Law Judge's determination of Claimant's disability regarding the issue of transferrable skills that requires remand for explanation of that point. The case is remanded for further proceedings consistent with this opinion.

## PROCEDURAL HISTORY

Claimant first applied for benefits on January 19, 2010, alleging a disability onset date of July 15, 2008. (R. 65.) The Social Security Administration ("SSA") denied Claimant's application on April 2, 2010 (R. 71), and again upon reconsideration on September 28, 2010 (R. 88). Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (R. 98.) Claimant's hearing occurred on January 19, 2012 (R. 26), after which the ALJ issued a decision denying Claimant's request for benefits (R. 8-20). The Appeals Council denied Claimant's request for review on September 26, 2013 (R. 1-3), and the ALJ's decision is the final decision of the Commissioner. *See Villano v. Astrue*, 556 F.3d 558, 561-62 (7th Cir. 2009). Claimant died on February 13, 2013, while his request for review was pending with the Appeals Council. (Pl.'s Br. at 2, n.1.) His spouse, Venera Swaiss, requested leave to proceed on behalf of her deceased husband. (R. 150-54.) That request was granted, and she brought this action. (Compl.)

## BACKGROUND

### Claimant's Medical and Work Histories

Claimant applied for benefits at age 51, alleging that he had been disabled since age 49 because of a heart condition and complications from diabetes, including nerve damage and severe

pain in his legs. (R. 18, 65-67, 293.) Claimant graduated from high school in Jordan in 1976. (R. 41.) Before the alleged onset of his disability, Claimant's previous employment included owning a liquor store, two tobacco stores, a beauty shop, serving as a dealer for Verizon Wireless, and working at a White Hen convenience store. (R. 45-46.) Claimant had enough quarters of coverage to remain insured through December 31, 2014. (R. 11.)

Claimant's medical records indicate a history of various heart-related issues, including coronary artery disease, peripheral vascular disease, hypertension, and hypercholesterolemia. (R. 357.)[2] Claimant testified at the hearing that he first had stents placed in 2004. (R. 34.)[3] Claimant's medical records indicate that he was diabetic as of January 5, 2007. (R. 480.)

Claimant also testified that he left the White Hen store in March 2008, and that he last worked in May 2008. (R. 29-30.) He spent April 2008 trying to "get his money back from White Hen," but in May, he testified, he stopped working because his "body was almost deteriorating

---

[2] Coronary Artery Disease is "atherosclerosis of the coronary arteries, which may cause angina pectoris, myocardial infarction, and sudden death. Both genetically determined and avoidable risk factors contribute to the disease; they include hypercholesterolemia, hypertension, smoking, diabetes mellitus, and low levels of high density lipoproteins." *See Dorland's Illustrated Medical Dictionary* 531 (32d ed. 2012) [hereinafter *Dorland's*].

*Dorland's* does not define peripheral vascular disease. The University of Chicago Hospitals defines it as "a slow and progressive circulation disorder. It may involve disease in any of the blood vessels outside of the heart and diseases of the lymph vessels—the arteries, veins, or lymphatic vessels. Organs supplied by these vessels such as the brain, heart, and legs, may not receive adequate blood flow for ordinary function. However, the legs and feet are most commonly affected, thus the name peripheral vascular disease." http://www.uchospitals.edu/online-library/content=P00236.

Hypertension is defined as "high arterial blood pressure." *Dorland's* at 896.

Hypercholesterolemia is defined as "excessive cholesterol in the blood." *Dorland's* at 887.

[3] A stent is "a slender rodlike or threadlike device used to provide support for tubular structures," including intravascular stents. *Dorland's* at 1770.

3

because of the neuropathy from diabetes, chest pain and that kind of stuff. . . . So, I decided . . . not to work because I couldn't perform like I used to." (R. 30.) Specifically, Claimant testified that "I couldn't [work]. Because, with the chest pain and then later on I did have two stents in my heart. So, every time when I carry something heavy, I feel the chest pain." (R. 32.) Claimant also testified that he did not continue working at the White Hen because he was not making money after it was sold to 7-Eleven. (R. 31-32.) Claimant was asked, "But, you decided then to stop because they weren't paying you," to which he responded, "At that time financially, yes." (R. 32.)

Claimant's certified earning records, however, indicate substantial gainful employment activity in 2008 and 2009. (R. 184.) Claimant testified the self-employment earnings were actually his wife's earnings as a restaurant owner. (R. 29-30.)[4] Claimant denied working at his wife's restaurant despite treatment notes from March 2009 and February through May 2010 that list his occupation as "cook." (R. 444, 469, 542, 545.) Notes from a diabetes treatment indicate he was working 72 hours per week as of September 2009. (R. 460.)

In March 2009, Claimant's primary care provider noted that Claimant's diabetes worsened, but he was not experiencing any complications with his diabetes medications. (R. 469.) At an August 2009 appointment, Claimant's physician indicated his diabetes was unchanged. (R. 465.) Claimant received a change in his diabetes treatment on August 31, 2009, when his physician prescribed insulin. (R. 461.) In September 2009, Claimant's physician indicated his diabetes had improved and there were no complications with medication. (R. 455.) Claimant denied polyuria, polyphagia, polydipsia, change in vision, foot ulcerations, and hypoglycemic episodes. (R. 455,

---

[4] After the ALJ's decision, Claimant submitted a statement by his tax preparer saying that Claimant and his wife were filing an amended return for 2009 showing the business and self-employment income belonged to his wife. (R. 302-309.)

699.)[5]  Claimant's diabetes continued to improve or remain stable from 2009 to 2011.  (R. 443, 449, 539, 683, 688, 699.)

In May 2009, Claimant underwent a coronary artery bypass graft. (R. 432.)[6]  In June 2009, Claimant underwent a cardiac catheterization of the right coronary artery and had a stent placed. (R. 357.)[7]  Claimant's medical records indicate normal cardiovascular evaluations through February 2010.  (R. 444-45, 450-51, 456, 465.)

Claimant went to the emergency room in May 2010 complaining of chest pain but was discharged in stable condition.  (R. 501.)  A checkup appointment in June 2010 indicated Claimant felt better.  (R. 590.)  A diabetes follow-up appointment in July 2010 also showed normal cardiovascular results.  (R. 537-39.)  However, Claimant underwent surgery in September 2010 to place a stent in his left anterior descending artery after he was admitted with chest pain and an

---

[5] Polyuria is "the passage of a large volume of urine in a give period, as in diabetes mellitus." *Dorland's* at 1494.

Polyphagia is "excessive eating; gluttony."  *Dorland's* at 1492.

Polydipsia is "chronic excessive thirst and intake of fluid . . . ."  *Dorland's* at 1488.

Ulceration is "the formation or development of an ulcer."  *Dorland's* at 1998.

Hypoglycemia is "an abnormally diminished concentration of glucose in the blood . . . ." *Dorland's* at 902.

[6] A bypass graft is "an autograft consisting of a segment of vein or artery grafted into place in a bypass."  *Dorland's* at 800.

[7] Cardiac catheterization is the "passage of a small catheter through a vein in an arm or leg or the neck and into the heart, permitting the securing of blood samples, determination of intracardiac pressure, detection of cardiac anomalies, planning of operative approaches, and determination, implementation, or evaluation of appropriate therapy."  *Dorland's* at 307.

abnormal stress test. (R. 573.) Records from follow-up appointments in November 2010 and August 2011 indicated Claimant generally was doing well, was participating in cardiac rehabilitation, and his peripheral vascular disease was stable. (R. 569, 570.) Claimant participated in cardiopulmonary rehabilitation in September 2011, where he reported feeling fine, tolerated exercise well, and denied any chest pain or discomfort. (R. 653.) Claimant's medical records indicated his hypertension was benign and stable from August 2007 onward, with Claimant denying symptoms in March 2009. (R. 443, 449, 465-66, 469, 478-79, 539, 660, 673, 683, 699.) Claimant's hypercholesterolemia was stable from August 2007 onward. (R. 465-66, 471, 478-79, 539, 660, 683, 699.)[8]

Claimant was diagnosed as having neuropathy in June 2010. (R. 590.)[9] Subsequent medical records from February 2011 showed the presence of neuropathy as part of Claimant's medical history. (R. 624.) Claimant's medical records from March to November 2011 also indicated the presence of neuropathy. (R. 626-32.) In October 2011, Claimant's medical records listed that his neuropathy was doing well with the medications he was taking. (R. 660.)

Claimant's medical records also indicated he suffered from osteoarthritis and restless legs syndrome. (R. 660, 666.) [10] Claimant frequently complained of pain in both his back and legs. (R.

---

[8] Hypercholesterolemia is also noted in Claimant's medical records as hyperlipidemia, which according to Dorland's is "a general term for elevated concentrations of any or all of the lipids in the plasma, such as hypertriglyceridemia, hypercholesterolemia, and so on." *Dorland's* at 891.

[9] Neuropathy is "a functional disturbance or pathological change in the peripheral nervous system, sometimes limited to noninflammatory lesions as opposed to those of neuritis; the etiology may be known or unknown. Known etiologies include complications of other diseases (such as diabetes or porphyria) . . . ." *Dorland's* at 1268.

[10] Osteoarthritis is "a noninflammatory degenerative joint disease seen mainly in older persons, characterized by degeneration of the articular cartilage, hypertrophy of bone at the margins,

614, 683, 692, 714.) Claimant asserted he had pain in his hip, although the majority of his medical records only refer to pain in his legs. (R. 463.) A March 2010 magnetic resonance image ("MRI") of Claimant's lumbar spine indicated degenerative disc disease, or osteoarthritis, with no sign of spinal stenosis. (R. 487.)[11] An ultrasound of Claimant's legs in February 2010 was normal, but he reported severe pain that grew worse at night. (R. 714.) Claimant stated that the prescription drug Norco helped the pain. (R. 714.) Claimant reported that his leg pain was getting worse in April 2010. (R. 545.) In June 2011, Claimant adjusted his medications, and by October 2011 he reported his restless legs syndrome was doing much better. (R. 660, 666.)

Claimant's most recent medical records indicated that he was experiencing numbness and tingling in his arms, with his left arm worse than his right. (R. 656.) Claimant also reported in that same appointment that he was experiencing insomnia. (*Id.*)

**State Medical Consultants' Opinions**

Claimant had a physical residual functional capacity assessment performed by state agency

---

and changes in the synovial membrane. It is accompanied by pain, usually after prolonged activity, and stiffness, particularly in the morning or with inactivity." *Dorland's* at 1344.

Restless Legs Syndrome is "unpleasant deep discomfort including paresthesias inside the calves when sitting or lying down, especially just before sleep, producing an irresistible urge to move the legs; the cause is unknown, but in some cases it may be due to inadequate circulation, a reaction to medication, or a complication of uremia." *Dorland's* at 1846.

[11] Magnetic Resonance Imaging "is a method of visualizing soft tissues of the body by applying an external magnetic field that makes it possible to distinguish between hydrogen atoms in different environments." *Dorland's* at 916.

Spinal Stenosis is "narrowing of the vertebral canal, nerve root canals, or intervertebral foramina of the lumbar spine caused by encroachment of bone upon the space." *Dorland's* at 1770.

medical consultant, Dr. Francis Vincent in March 2010. (R. 488-495.) The assessment indicated Claimant could occasionally lift and/or carry 20 pounds and frequently lift and/or carry ten pounds. (R. 489.) Dr. Vincent determined Claimant could stand and/or walk about six hours in and eight-hour workday, and sit for about six hours in an eight-hour workday. (*Id.*) The assessment showed Claimant could unlimitedly push and/or pull. (*Id.*) Claimant had no postural, manipulative, visual, communicative, or environmental limitations. (R. 490-92.) Dr. Vincent concluded that Claimant's allegations were "partially credible. He does have diabetes but there is no objective evidence that would account for the pain in his leg." (R. 495.) Another state agency medical consultant, Dr. Richard Bilinsky, reviewed and affirmed Dr. Vincent's opinion in September 2010. (R. 554-56.) Dr. Bilinsky agreed that, even after considering Claimant's complaints of increased pain and his treatment in May 2010, Claimant was capable of the full range of light work. (R. 556.)

## HEARING

### Claimant's Testimony

Claimant appeared with counsel before the ALJ on January 19, 2012. (R. 28.) As previously noted, Claimant's employment earnings records for 2008 and 2009 showed he engaged in substantial gainful employment, and medical records indicated he was working as a cook. However, Claimant denied working as a cook. (R. 32-34.)

Claimant stated that he had difficulty sitting for longer than about 45 minutes before he needed to stand up, as a result of his neuropathy, arthritis, and restless legs syndrome. (R. 35, 43-44.) Claimant also testified he could stand easily for 15-20 minutes, after which he needed to sit down. (*Id.* at 35.) Claimant stated that he could walk a block, but would be limping because of the

pain in his legs. (*Id.*) While Claimant asserted his main issues were diabetes and leg pains, he also stated he had back problems periodically. (R. 37.) Claimant further testified he started having difficulty with concentrating around the time of the hearing. (R. 43.)

Regarding daily living, Claimant testified that as of July 2010 he was leading a very stressful lifestyle because of financial issues, including not working, his wife losing her restaurant, and being behind on property taxes. (R. 37-38.) Claimant testified that he lived with his wife and two children, but that he did not participate in activities with them. (R. 38.) Claimant also testified that he performed almost no household chores, and explicitly denied doing yard work, and said that he "rarely" cooked. (R. 38-39.) Claimant stated that he participated in grocery shopping, but that he does not go to large stores that involve walking longer distances. (R. 42.) Claimant testified he could lift ten pounds easily, but when lifting more than ten pounds he felt pressure in his chest. (R. 41.) Claimant asserted he had difficulty with the basement stairs in his house because he felt heavy, like his "bones are not flexible," and that he would get tired. (R. 39-40.) Claimant stated he had no hobbies and would spend his time on the computer and watching television. (R. 40.)

**Vocational Expert's Testimony**

After Claimant testified, the ALJ posed a series of questions to a vocational expert ("VE") about Claimant's ability to work. (R. 50-60.) The VE testified that the occupation best describing Claimant's past relevant work was that of an assistant manager in the retail industry, which is at the medium exertion level, is hands on, and involves stocking, serving as cashier, managing payroll, ordering supplies, sales, and cleaning. (*Id.*) The ALJ then gave the VE the following hypothetical:

Then let's assume a person, let's assume a person who can lift and carry 20 pounds

occasionally, ten pounds frequently. They can stand and walk six hours in an eight-hour workday and sit six hours in an eight-hour workday. The person: can occasionally climb ramps and stairs; can never climb ladders, ropes or scaffolds; can occasionally balance, stoop, kneel, crouch and crawl. The person cannot work directly with hazardous machines, with moving mechanical parts. The person cannot work in high exposed places. A person with this functional capacity, could they perform Claimant's past work?

(R. 50-51.) The VE responded that nothing in the hypothetical would prevent an individual from working as an assistant manager of a retail operation at the light level of exertion, but not the medium level of exertion. (R. 51.) The VE further clarified that Claimant's previous work at White Hen was at the medium exertional level, but his other positions were performed at the light level. (R. 51.) The VE was then asked by the ALJ whether there were positions in the regional economy that a person could perform with the same age, education level, and work experience as the Claimant had at the alleged onset date when he was 49 years old. (R. 52.) The VE opined that a person in that hypothetical could be a cashier checker, salesclerk, or a restaurant host. (*Id.*) In a follow-up question from the ALJ, the VE stated his opinion regarding Claimant's ability to perform the positions of cashier checker, salesclerk, and host would not change if Claimant was 50. (R. 58-59.)

The ALJ then changed the hypothetical posed to the VE:

Then let's assume then a person who can lift and carry ten pounds frequently. They can stand and/or walk two hours in an eight hour work day and sit six hours in an eight hour work day. When they're sitting, they can sit for a continuous period of time of up to 45 minutes and they can – then they need to stand and/or walk for approximately 15 minutes before sitting again. The person can occasionally climb ramps and stairs. They can never climb ladders, ropes or scaffolds. They can occasionally balance, stoop, kneel, crouch and crawl. They cannot work directly with hazardous machines, with moving mechanical parts. They cannot work in high exposed places. And the person is unable to meet fast paced high production demands, such as in factory assembly line work. Can a person with this functional capacity and Claimant's age at the alleged onset date, which was 49 years old and the same education and work experience, perform any jobs in the national or regional economy?

(R. 52-53.) The VE responded that the jobs corresponding to that hypothetical included sedentary work such as customer order clerk, service clerk, and repair order clerk. (R. 53.) The VE also opined that the Claimant's transferrable skills were in customer service, record keeping, knowledge of equipment, inventory and supplies, sales and servicing. (*Id.*) The skills would be transferrable in the second hypothetical even at age 50, and those that would need additional skills could be learned in no more than 30 days. (R. 54.) The VE opined the Claimant would have required more than a minimal vocational adjustment at age 55. (R. 55.)

Claimant's counsel also posed a series of hypothetical questions to the VE, including the effect of manipulative limitations, pain, and needing to alternate between sitting and standing on available jobs. (R. 56-58.) The VE opined that a limitation on handling, fingering and feeling to one-third of the day to less would preclude the jobs. (R. 56.) He also testified that a person typically would need to stay at the assigned station rather than pacing, and that if the person was distracted by pain more than one-third of the day, the person could not meet the requirements for full time competitive work. (R. 57-58.)

## DISABILITY DETERMINATION PROCESS

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The regulations prescribe a five-part sequential test for determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. Under the regulations, the Commissioner must consider the following: (1) whether the claimant has

performed any substantial gainful activity during the period for which she claims disability; (2) if she has not performed any substantial gainful activity, whether the claimant has a severe impairment or combination of impairments; (3) if the claimant has a severe impairment, whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe and of such duration as to preclude substantial gainful activity; (4) if the impairment does not meet or equal a listed impairment, whether the claimant retains the residual functional capacity to perform her past relevant work; and (5) if the claimant cannot perform her past relevant work, whether she is unable to perform any other work existing in significant numbers in the national economy. *Id.*; *Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001). An affirmative answer at steps one, two, or four leads to the next step. *Zurawski*, 245 F.3d at 886. An affirmative answer at steps three or five requires a finding of disability, whereas a negative answer at any step other than step three precludes a finding of disability. *Id*. The claimant bears the burden of proof at steps one through four. 20 C.F.R. § 404.1560(c)(2). If that burden is met, at step five the burden shifts to the Commissioner to provide evidence that other work exists in significant numbers in the national economy that the claimant is able to do. *Id.*

### THE ALJ'S DECISION

Employing the five-step process, the ALJ concluded in her January 2012 decision that Claimant was not disabled. (R. 11-20.) At step one, the ALJ gave Claimant the "benefit of the doubt" and found that Claimant had not engaged in any substantial gainful activity since July 15, 2008, notwithstanding the records demonstrating earnings constituting substantial gainful activity in 2008 and 2009. (R. 13.) At step two, the ALJ found that the Claimant had severe impairments,

including hypertension, diabetes mellitus, peripheral vascular disease, generalized osteoarthritis, restless legs syndrome, and peripheral neuropathy. (*Id.*) At step three, the ALJ concluded that the Claimant's impairments did not meet or medically equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 14.) At step four, the ALJ determined Claimant had the residual functional capacity ("RFC") to perform light work defined in 20 C.F.R. § 404.1567(b) and § 416.967(b), except that he could occasionally climb ramps and stairs, balance, stoop kneel, crouch and crawl, but never climb ladders, ropes, scaffolds, work with hazardous machines with moving, mechanical parts, and he cannot work in high, exposed places. (R. 14.) Given that assessment, the ALJ found that Claimant could not perform his past relevant work. (R. 18.) At step five, however, the ALJ found that, based on the VE's testimony, Claimant would be able to work as a cashier checker, sales clerk, and host. (R. 19.)

In making her decision, the ALJ explained that while she found Claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms, "the Claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment and the evidence." (R. 15.) The ALJ noted several inconsistencies in Claimant's work history, including Claimant's reports in the initial disability report and at the hearing that reported he stopped working both because of his impairments and because of poor business. (R. 17.) According to the ALJ, that fact, in addition to Claimant's treatment notes indicating he was working as a cook in 2009 and 2010, detracted from his overall credibility and did not support his assertion he could no longer work due to his impairments. (*Id.*) The ALJ further noted that although the Claimant reported doing no physical activity, including no housework or yard work, the medical

evidence did not support such limited daily activities.  (*Id.*)

In regard to the opinion evidence, the ALJ gave "some weight" to the opinions of the state agency medical consultants.  (*Id.*)  However, the ALJ stated the medical records demonstrated "ongoing difficulties with [Claimant's] legs due to peripheral neuropathy and restless legs syndrome that support the additional postural limitations and limited exposure to hazards as set forth in the above residual functional capacity."  (R. 18.)  The ALJ gave little to no weight to a treatment provider's note in September 2010 limiting Claimant to lifting no more than five pounds for seven days after the surgery to insert the stent, because it provides no assistance in determining the Claimant's ongoing limitations and abilities.  (*Id.*)

## STANDARD OF REVIEW

The Social Security Act provides for limited judicial review of a final decision of the Commissioner.  *See* 42 U.S.C. § 405(g).  Where the Appeals Council declines a requested review of an ALJ's decision, it constitutes the Commissioner's final decision.  *Villano*, 556 F.3d at 561-62. While an ALJ's legal conclusions are reviewed *de novo*, her factual determinations are reviewed deferentially and are affirmed if they are supported by substantial evidence in the record.  *Jones v. Astrue,* 623 F.3d 1155, 1160 (7th Cir. 2010); *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Evidence is substantial if it is sufficient for a reasonable person to accept it as adequate to support the decision.  *Jones*, 623 F.3d at 1160; *Craft*, 539 F.3d at 673.  "Although this standard is generous, it is not entirely uncritical," and the case must be remanded if the decision lacks evidentiary support. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

When evaluating a disability claim, the ALJ must consider all relevant evidence and may not

select and discuss only the evidence that favors her ultimate conclusion. *See Murphy v. Astrue*, 496 F.3d 630, 634-35 (7th Cir. 2007); *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Although the ALJ is not required to discuss every piece of evidence, the ALJ must provide an accurate and logical bridge between the evidence and the conclusion, so that a reviewing court may assess the validity of the agency's ultimate findings and afford the Claimant meaningful judicial review. *Craft*, 539 F.3d at 673. "If the Commissioner's decision lacks adequate discussion of the issues, it will be remanded." *Villano*, 556 F.3d at 562.

The harmless error doctrine applies when reviewing social security decisions. "[T]he court need not remand if it is satisfied that the error did not affect the outcome." *Mattison v. Astrue*, No. 09-C-60, 2009 WL 2591628, at *1 (N.D. Ill. Aug. 21, 2009) (citing, *e.g.*, *Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir. 2003)).

## DISCUSSION

Plaintiff contends that the ALJ should have found that at most Claimant had an RFC for sedentary rather than light work, and that without transferable skills, Plaintiff would be disabled by his 50th birthday, November 6, 2008. (Pl.'s Br. at 10.) Plaintiff argues the ALJ improperly assessed Claimant's RFC, ignored evidence of Claimant's obesity, improperly assessed Claimant's credibility, and failed to identify Claimant's transferrable skills. (Pl.'s Br. at 7-17.)

As set out below, the court concludes that the ALJ properly assessed Claimant's RFC, that the ALJ did not ignore evidence of Claimant's obesity, or, if she did, such error was harmless, and that her assessment of Claimant's credibility was sufficiently explained and supported by substantial evidence. There is, however, an inconsistency in the ALJ's determination of Claimant's disability

regarding the issue of transferrable skills that requires remand for explanation of that point.

## 1. The ALJ's RFC Finding

Plaintiff argues the ALJ failed to provide an evidentiary basis for her assessment of Claimant's RFC. The ALJ gave "some weight" to the opinions of the state medical consultants who, as noted above, found that Claimant could do a full range of light work, but the ALJ also found that Claimant had some additional limitations. (R.14, 17- 18.)[12] Plaintiff asserts that the ALJ should have found that Claimant was only able to do sedentary work. (Pl.'s Br. at 10.)

Plaintiff faults the ALJ's finding in two respects. First, Plaintiff asserts that by finding that Claimant was more restricted than the state medical consultants did, the ALJ "was left without medical evidence to support her RFC finding, as the state agency physicians provided the only medical opinions regarding the impact that [Claimant's] impairments had on his functional capacity." (Pl.'s Br. at 8.) This, according to Plaintiff, left the ALJ with "an evidentiary deficit" which the ALJ could not fill with her lay medical knowledge. That, however, is not an accurate characterization of the ALJ's opinion. The ALJ gave some weight to the opinions of Dr. Vincent and Dr. Bilinsky, but the ALJ also considered the evidence of Claimant's testimony to the degree she found that it credibly supported further limitations. "[I]f a medical opinion adverse to the claimant

---

[12] 20 C.F.R. §§ 404.1567(b) and 416.967(b) define light work as: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."

has properly been given substantial weight, the ALJ does not commit reversible error by electing to temper its extremes for the claimant's benefit." *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012). Unlike *Bailey v. Barnhart,* 473 F. Supp. 2d 822 (N.D. Ill. 2006), the case cited by Plaintiff, there is no medical evidence in the record here that supports greater limitations than the ALJ found.

Plaintiff further argues that, although the ALJ accepted some additional limitations based on Claimant's testimony, she failed to identify evidence to support her conclusion that Claimant could not perform some functions (e.g., climbing ladders) but could perform others (such as occasionally climbing stairs). Plaintiff contends that the ALJ should have discussed her decision to accept some of Claimant's testimony, but reject other portions of the testimony.

The Seventh Circuit has described the review of an ALJ's RFC determination in a number of non-precedential orders. "Although the 'RFC assessment is a function-by-function assessment,' SSR 96-8p, the expression of a claimant's RFC need not be articulated function-by-function; a narrative discussion of a claimant's symptoms and medical source opinions is sufficient." *Knox v. Astrue*, 327 Fed. Appx. 652, 657 (7th Cir. 2009) (citing opinions from other circuits and stating that an ALJ satisfied the discussion requirements by analyzing the objective medical evidence, the claimant's testimony and credibility, and other evidence). While the ALJ is not allowed to substitute her opinion for that of a physician, the ALJ must weigh the evidence and making appropriate inferences from the record. *Seamons v. Astrue*, 364 Fed. Appx. 243, 247-48 (7th Cir. 2010) (upholding an ALJ's determination of an RFC that reflected a thorough review of the medical records and a reasonable weighing of the evidence both for and against a greater RFC limitation).

In this case, the ALJ's RFC determination is supported by substantial evidence. The ALJ's conclusions about Claimant's capacity were supported by a lengthy discussion of the medical records

upon which the ALJ relied in making her determination, undermining Plaintiff's argument that the ALJ filled in evidentiary gaps with her own medical knowledge. (R. 14-18.) The ALJ acknowledged Claimant's diabetes and peripheral neuropathy but also noted the medical records stating that Claimant's diabetes was controlled and that his peripheral neuropathy was doing well with medication. (R. 15, 17 (citing R. 660).) The ALJ then accommodated those conditions by limiting Claimant's RFC to the light exertional level and further limiting climbing, balancing, stooping, kneeling, crouching, crawling, and exposure to hazards. (R. 17.) In addition, the ALJ specifically questioned the VE during the hearing by using hypothetical scenarios that analyzed what positions the Claimant could perform given the light work limitations of 20 C.F.R. §§ 404.1567(b) and 416.967(b) and the additional postural limitations and limited exposure to hazards the ALJ ultimately imposed. (R. 50-54.)

Regarding Plaintiff's argument that the ALJ failed to explain why she accepted some of Claimant's assertions but rejected others, Plaintiff again does not cite any medical evidence that the ALJ ignored in accepting only certain limitations. Plaintiff argues that "the ALJ did not explain how the evidence did not support a finding that [Claimant] was limited to work at the sedentary exertional level," which allows a limitation of standing or walking two hours in an eight -hour day rather than the six hours expected in a light level of work. (Pl.'s Br. at 10, citing SSR 83-10.) There is no medical evidence, however, that Claimant was limited to standing only two hours per work day. On the contrary, the state agency medical consultants opined that Claimant could do the full range of light work, which would include the six-hour standing or walking requirement. Plaintiff cites the findings of the MRI study performed in March 2010 in connection with Claimant's reports of back and leg pain. (Pl.'s Br. at 9-10, citing R. 487). However, the conclusion of that MRI was "Mild L5-

S5 degenerative disc disease" and "No evidence of spinal stenosis." (R. 16 (citing R. 487).) The ALJ noted these results in her opinion, as well as the fact that the alterial ultrasound of Claimant's legs was normal. (R. 16.) The only evidence to support further limitation was Claimant's testimony, which the ALJ did not entirely credit. As discussed further below, the ALJ's decision to give limited credit to Claimant's testimony was adequately described and supported by the evidence.

### 2.    Consideration of Claimant's Obesity

Plaintiff argues the ALJ failed to account for the effects of Claimant's obesity. (Pl.'s Br. at 12.) Plaintiff cites a medical record from August 2011 in which Claimant's height was listed as 5'4" and his weight was listed as 180 pounds, yielding a body mass index ("BMI") of 30.9. (*Id.*)[13] According to Social Security Ruling 02-1p, that placed Claimant in the Obesity Level I category.[14] Plaintiff argues the ALJ should have found Claimant to be obese, discussed the effect of his obesity both on his other impairments and by itself, and discussed the impact of Claimant's obesity on the ALJ's RFC determination. (*Id.* at 12-14.)

The Commissioner points out that neither Claimant nor his counsel addressed Claimant's weight in the hearing, nor was obesity mentioned in Claimant's application documents. (Def.'s Mem. at 7.) The Commissioner contends the record does not demonstrate Claimant had any obesity-related limitations that the ALJ did not assess, and his medical records do not indicate his

---

[13] Body Mass Index is "the weight in kilograms divided by the square of the height in meters, a measure of body fat that gives an indication of nutritional status." *Dorland's* at 930.

[14] The National Institute of Health Clinical Guidelines recognize three levels of obesity: Level I (BMI 30.0-34.9), Level II (BMI 35.0-39.9), and Level III (BMI equal or greater than 40.0). SSR 02-1p.

problems were caused or aggravated by obesity. (*Id.* at 8.)

The evidence with respect to Claimant's obesity is very limited. Claimant did not mention his weight at any point in the hearing or in his disability application, nor did he indicate that his weight was a limitation or that it affected his functioning. Notably, Claimant's extensive medical records indicate his weight fluctuated over the years. Claimant's BMI and the indication of "obesity" are noted only in 2011 where they appear as a routine entry on intake forms when Claimant appeared for follow-up for other conditions. (R. 626-632.) Claimant's treating medical professionals do not note his obesity beyond that form. There is no discussion in Claimant's medical record that Claimant's weight had an impact on his other conditions or that it required treatment.

Plaintiff cites a number of decisions requiring the ALJ to consider the disabling effect of obesity, even if the claimant does not list it as an impairment, where the evidence fairly raises the issue. In all of those decisions, the claimant's obesity was more extreme than Claimant's borderline condition. In *Clifford v. Apfel*, 227 F.3d 863, 873 (7th Cir. 2000), for example, the claimant was woman 5'3" tall weighing 199 pounds, and the record contained "numerous references in the record to Clifford's 'excessive' weight problem." In one of the three claims consolidated under *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011), the claimant specifically identified her obesity as an impairment; at 5' 1" tall and 205-220 pounds she had a BMI of 40, which is "extremely obese." *See also Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005) (claimant was woman 5'11" tall weighing 275 pounds); *Barrett v. Barnhart*, 355 F. 3d 1065, 1066 (7th Cir. 2004) (claimant was "extremely obese, weighing more than 300 pounds although she is only 5 feet 1 inch tall"). Here, however, without any additional discussion by the treating medical professionals or complaints from Claimant, it is questionable whether the minimal references in the record were sufficient to alert the ALJ to any

issue about obesity.

The ALJ has the burden of developing the record, but that burden is balanced by the Claimant's obligation to explain why certain conditions are disabling. *See Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014) ("Although we have recognized the claimant's obligation to explain why certain conditions are disabling . . . it is the ALJ who carries the burden of developing the record . . ."). "An ALJ must consider any limiting effects of obesity on a claimant's overall condition even if the claimant does not cite obesity as an impairment . . . [b]ut the claimant must articulate how her obesity limits her functioning and exacerbates her impairments." *Hisle v. Astrue*, 258 Fed. Appx. 33, 37 (7th Cir. 2007) (reaffirming that the Seventh Circuit has repeatedly excused the harmless error of an ALJ who fails to explicitly address a claimant's obesity but arrives at a final decision after reviewing the medical opinions of physicians familiar with the claimant's obesity). When a claimant does not specifically claim obesity as an impairment, but references to weight in the record were sufficient to alert the ALJ to the impairment, the reviewing court may still apply harmless error review to determine whether consideration of the obesity would have affected the outcome of the case. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).

Even assuming the minimal references to Claimant's obesity were sufficient to alert the ALJ of the condition, remand for consideration would not be appropriate. Neither Claimant nor any doctor identified any way in which Claimant's weight impaired his ability to work, either by itself or in combination with his other impairments. "The social security benefits program in not concerned with health as such, but rather with ability to engage in full-time gainful employment. A person can be depressed, anxious, and obese yet still perform full-time work." *Gentle*, 430 F.3d at 868. The ALJ's decision indicates that she gave Claimant's medical records thorough

consideration in making her determination by including extensive reference and discussion of each of Claimant's medical issues. Although the ALJ did not explicitly consider Claimant's obesity, it was indirectly factored into the ALJ's decisions as part of the doctor's opinions. *See Hisle,* 258 Fed. Appx. at 37. "If it is predictable with great confidence that the agency [would] reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, [and therefore] remanding is a waste of time." *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). Even assuming the ALJ should have addressed the Claimant's obesity, the result likely would not change because of that factor.[15]

### 3.    Claimant's Credibility

Plaintiff asserts the ALJ erred by failing to provide an adequate explanation why she rejected Claimant's report of his activities of daily living and by failing to support her finding pursuant to Social Security Ruling 96-7p, which describes the process by which an adjudicator should evaluate alleged symptoms. (Pl.'s Br. at 16.) Plaintiff specifically claims that the ALJ did not consider Claimant's inability to perform household chores in light of the intensity, severity and limiting

---

[15]    Plaintiff also argues that the Commissioner's current arguments violate the *Chenery* doctrine, which prohibits the Commissioner's lawyers from defending the agency's decision on grounds that the agency itself did not embrace. *Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012) (citing *SEC v. Cherney Corp.*, 318 U.S. 80, 87-88 (1943)). That argument, however, suggests that the ALJ explicitly considered Claimant's obesity during the proceedings below and rejected or excluded the limitations, and that the Commissioner is now advancing a different argument or defense here. The Commissioner does not violate the *Cherney* doctrine by responding to an argument that was not raised before the ALJ and is now being raised by Plaintiff for the first time. In any event, "[t]he harmless-error doctrine is available in judicial review of administration action; it is an exception to the *Chenery* principle." *Sahara Coal Co. v. Office of Workers Compensation Programs, U.S. Dept. of Labor*, 946 F.2d 554, 558 (7th Cir. 1991).

effects of the pain he experienced.  (*Id.* at 17.)

The ALJ must consider a claimant's subjective complaints of pain and its effects to him even where the available objective evidence does not substantiate the claimant's statements.  *Briscoe v. Barnhart*, 425 F.3d 345, 354 (7th Cir. 2005). SSR 96-7p directs that in assessing the credibility of an individual's statements about pain, symptoms, and the effect on functioning, the ALJ should consider all evidence in the case record.  That includes, among other things, medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work. "A reviewing court may reverse an ALJ's credibility determination only if it is so lacking in explanation or support that it is 'patently wrong.'"  *Williams-Overstreet v. Astrue*, 364 Fed. Appx. 271, 275 (7th Cir. 2010) (citing *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009); *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008)).  However, the ALJ must justify credibility findings with specific reasons supported by the record.  *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009).

The ALJ found that Claimant's "medically determinable impairments could reasonably be expected to cause the alleged symptoms."  (R. 15.)  However, the ALJ found that Claimant's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment and the evidence." (*Id.*)  After considering  the medical evidence, the ALJ stated she considered other factors enumerated in SSR 96-7p, including  the inconsistencies in Claimant's work history and his testimony about his extremely limited daily activities.  (R. 17.)

The ALJ did not limit her discussion to conclusory statements.  She noted Claimant stopped working for reasons other than his medical impairments.  (*Id.*)  Claimant indicated in his initial

disability report and work activity report that he stopped working due to poor business as well as his impairments. (R. 195, 222.) He similarly testified at the hearing that he stopped working because he was not receiving pay. (R. 32.) Further, although Claimant denied working at his wife's restaurant or as a cook during the hearing, treatment notes in March 2009 and February through May 2010 state that he was working as a cook. (R. 30, 444, 469, 542, 545.) The ALJ referred to the treatment notes dated September 2009 in which Claimant told the treating doctor that he worked 72 hours per week. (R.17.) The ALJ could properly consider these inconsistencies as detracting from Claimant's overall credibility. "The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. Especially important are statements made to treating or examining medical sources . . . ." SSR 96-7p.

Plaintiff argues that the ALJ should have asked Claimant why his medical records reflected an occupation of "cook" because he may have had an explanation. (Pl.'s Reply at 8.) However, the ALJ did ask Claimant about the fact that his medical records showed his occupation as "cook," but Claimant gave no explanation beyond saying he was never a cook. (R. 33.) The ALJ asked, "Did you ever tell the doctors you were a cook?" Claimant answered, "I don't remember." (*Id*.)

The ALJ next considered the Claimant's daily activities. (R. 17.) The ALJ specifically noted that Plaintiff stated he did not participate in any household chores. (*Id*, citing R. 233, 273.) The ALJ further considered Claimant's testimony that he did almost no household chores and no yard work. (R. 17, citing 38-39.) The ALJ concluded that the medical evidence did not support such severely limited daily activities and found Claimant's reported activities were outweighed by the other factors discussed in her decision. (R. 17.)

24

"Although an ALJ may not ignore a Plaintiff's subjective reports of pain simply because they are not supported by medical evidence, discrepancies between the objective evidence and self-reports may suggest symptom exaggeration." *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010) (holding that when determining a claimant's credibility, the ALJ properly relied upon the discrepancy between the objective evidence and claimant's self-report when the objective medical evidence consistently revealed only mild degenerative change). While Plaintiff argues the ALJ insufficiently explained why she rejected Claimant's report of his activities, the ALJ stated that she considered his statements in light of the analysis of the medical records she performed. When read in light of that analysis, substantial evidence supports the ALJ's determination that Claimant's reports and testimony regarding his daily activities were not entirely credible, and the ALJ was not patently wrong in making her credibility determination.

### 4.  Identification of Claimant's Transferable Skills

Plaintiff finally argues the ALJ erred at step five in the process in determining that Claimant could perform other jobs in the national economy. (Pl.'s Br. at 14.) As discussed above, the ALJ found that Claimant was able to perform work at the light level, but with some limitations. She found that Claimant could not perform his past relevant work, which the VE described as at the medium level. (R. 18.) She found that Claimant was 49 years old at the time of the alleged onset of disability but at the time of the decision was "closely approaching advanced age" as defined in the regulations. He had at least a high school education and was able to communicate in English. (*Id*.)

The ALJ then held that the "[t]ransferability of job skills is not material to the determination

of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' *whether or not the claimant has transferable job skills.*" (R.18, citing SSR 82-41 and 20 C.F.R. Part 404, Subpart P, App. 2) (emphasis added). The Medical Vocational Rules (sometimes called "the Grid") "direct a conclusion as to whether the individual is or is not disabled," but only if the findings as to that individual "coincide with all of the criteria of a particular rule." 20 C.F.R. Part 404, Subpart P, App. 2 § 200.00(a). The rules provide a "framework for consideration" when the individual has an impairment resulting in both strength limitations and nonexertional limitations. *Id.* § 200.00(e)(2).

The ALJ correctly observed that if Claimant could perform the full range of light work, the rules would direct a finding of "not disabled." (R. 19, citing Rules 202.21 (younger individual) and Rule 202.14 (closely approaching advanced age)). That would be so whether or not Claimant had transferrable skills. *See* Rules 202.14 and 202.21. However, the ALJ also found that Claimant's ability to perform the requirements of light work "has been impeded by additional limitations." (R. 19.)[16] Based on the VE's testimony, the ALJ concluded that Claimant could perform jobs that exist

---

[16] The ALJ analyzed Claimant's case under only the light work table found in the Medical Vocational Rules, 20 C.F.R. Part 404, Subpart P, App. 2, Table 2 . SSR 83-12 and 83-14 require that in cases where the individual does not squarely fall within the limitations for a given level of work, the tables for each given level should be analyzed together for differences, and, if necessary, a VE should be used to offer guidance. In addition, here, the ALJ was also required to consult listings for both younger individuals age 45-49 and individuals closely approaching advanced age because Claimant was defined as a younger individual when he first applied, but subsequently changed age category to closely approaching advanced age. 20 C.F.R. 404.1563 and 416.963. If the ALJ had considered the sedentary work RFC table as well as the light work RFC table in order to capture some of the additional limitations the ALJ determined existed for Claimant, the determination that Claimant is "not disabled" no matter the mix of transferable skills and skill base would come into question. *See* Medical Vocational Rules 201.12-16, 201.21-22, 202.14-15, 202.21-22. For instance, while an individual closely approaching advanced age with a high school education will not be disabled at any skill base on the light work RFC table, an individual closely approaching advanced age with a high school education may be disabled in the sedentary work RFC table,

in substantial numbers in the national economy. (R. 19.) The ALJ did not make a finding that Claimant had transferrable skills.

However, the VE testified that Claimant had transferrable skills of customer service, record keeping, knowledge of equipment, inventory and supplies, sales and servicing. (R. 53.) The VE's conclusion that Claimant could perform jobs such as cashier checker, sales clerk or host appears to have been based on those transferrable skills or, at best, was ambiguous on that point

> ALJ: [S]o, at 50, these jobs could be performed –
>
> VE: Yes. And at age –
>
> ALJ: – with the transferrable skills.
>
> VE: At age 55, it, it would be more than a minimal vocational adjustment, in terms of work setting, work processes.

(R. 55.)

> ALJ: My question is now if there was an age change and we looked [at] a person at the age of 50, would – and the claimant's same age, education and work experience, would the person still be able to perform the cashier checker, salesclerk and host positions?
>    . . . .
>
> VE: If there is no change in . . . mental functioning, then there's no reason to preclude that the, the idea that – of the person being able to perform skilled work and transferring skilled work.

(R. 58.)

The ALJ's reference to the VE's testimony makes the ALJ's opinion internally inconsistent or at best ambiguous. It is not clear that whether the ultimate conclusion was based on a finding of transferable skills or not. As noted above, the ALJ initially found that transferability of skills was

---

depending on the mixture of skill-base, skill transferability, and whether the individual can directly enter skilled work. *Id.* Therefore, transferability of job skills would be material to the determination of disability.

not material, yet the ALJ's reliance on the VE's testimony casts doubt on that finding.  When the transferability of skills is at issue, the ALJ must make specific findings of fact and state them in the decision, including identifying acquired skills and the specific occupations to which those skills are transferrable.   SSR 82-41(6); *see also Abbott v. Astrue*, 391 Fed. Appx. 554, 558 (7th Cir. 2010). Indeed, the Commissioner now suggests that the ALJ did consider transferability of skills, by arguing that ALJ's citation of the VE's testimony sufficiently identified the transferable skills.  (Def's Mem. at 10.)

Because of this uncertainty, the case must be remanded.  To the extent that the transferability of skills is, in fact, material to the conclusion of disability, that is a determination entrusted to the ALJ, not the VE, and the ALJ must express the factual basis for that decision in the opinion. A cursory reference to the VE's conclusion is insufficient. *Abbott*, 391 Fed. Appx. at 558 (discussing the requirements of SSR 82-41).

Because omission of this reasoning provides this Court with no basis to review the case under the substantial evidence standard, the case is remanded on this point.  The ALJ must clarify whether transferability of skills is material to her decision, and if so, must explicitly identify Claimant's transferable skills and the jobs to which they apply, in light of the Claimant's functional capacity and age.  Further, the harmless error doctrine cannot save the ALJ's decision because the court is not satisfied the error did not affect the outcome.


**CONCLUSION**

For the foregoing reasons, the Commissioner's motion for summary judgment is denied.  The

case is remanded pursuant to 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

Judgment is entered in favor of the Plaintiff and against the Commissioner.

Geraldine Soat Brown
United States Magistrate Judge

Date: January 16, 2015